IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GLENDA CAIN                          :
                                     :
          Plaintiff                  : CIVIL ACTION NO. 1:08-CV-1704
                                     :
     v.                              :
                                     :
WELLSPAN HEALTH                      :
                                     :
          Defendant                  :

## M E M O R A N D U M

Plaintiff Glenda Cain, an African-American female, is a former employee of Defendant Wellspan Health ("Wellspan"), and brought this suit alleging that Wellspan fired her because of her race and/or gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Additionally, Plaintiff's amended complaint asserts pendent state law claims of intentional infliction of emotional distress and breach of contract. Before the court is Wellspan's motion for summary judgment. (Doc. 35.) For the reasons that follow, the court will grant Wellspan's motion.

# I.     Background

## A.     Facts[1]

Glenda Cain is an African-American female who, until December 2006, had been employed by Wellspan since 1977.[2]  At the time of her termination, Cain was a team-leader in the York Hospital cafeteria.  (Def.'s Statement of Material Facts ("SMF") ¶ 4.)  As a team leader, Cain supervised a number of cafeteria employees, including Tracie McClune, a Caucasian female cafeteria cashier.  (*Id.* ¶¶ 5, 8.)  Cain's immediate supervisor was Timothy Bentzel, Wellspan's Director of Food Services.  (*Id.* ¶ 6.)

### 1.  Employment Policies

Wellspan maintains a number of different employment policies, including an Equal Employment Opportunity policy that prohibits discrimination on

---

[1] In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir. 1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order."  *Vadino*, 903 F.2d at 259.  Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts.  The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties.

In response to Wellspan's statement of material facts, Plaintiff filed a document which purports to dispute many of Wellspan's facts.  (Doc. 51.)  However, practically all of Plaintiff's purported denials lack any citation to evidence in the record or anything else.  This violates Local Rule 56.1 which states, in relevant part, that all "statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."  M.D. Pa. Local Rule 56.1.  Thus, the court will consider only those denials by Plaintiff that are accompanied by citations to the record.  All denials by Plaintiff unaccompanied by citation to the record will be deemed admitted.  *See id*. ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

[2] Plaintiff was actually an employee of York Hospital which is wholly-owned by Wellspan, but Wellspan does not contest that it is an improper party, and chose to use the terms "York Hospital" and "Wellspan" interchangeably.  (*See* Doc. 36 ¶ 4 n. 1.)  The court will do the same.

the basis of, among other protected categories, race and gender. (*Id.* ¶ 9.) Wellspan also has a Corrective Action Policy that expressly prohibits employees from "[k]nowingly creating incorrect time records for oneself or unauthorized entering of time records for another employee, or causing or allowing the same by another employee." (Doc. 36, Ex. B, Stephen R. Simon Aff., Ex. 1 (Corrective Action Policy), Pt. I.A.9.) The Corrective Action Policy makes it clear that knowingly creating incorrect time records is grounds for immediate discharge from employment. (*Id.*) Wellspan also has a Time Records Policy, which states, in relevant part, that "[r]ecording another employee's time record, willfully making, causing or allowing a false or misleading entry on a time record . . . is cause for corrective action up to and including termination of employment." (Simon Aff., Ex. 2 (Time Records Policy), Pt. V.B.) There is no dispute that Cain was aware of these policies, and that she was prohibited from allowing another employee to make time entries for her, and that she could be terminated for such conduct. (SMF ¶¶ 13, 18.)

While employed by Wellspan, Cain was paid on an hourly basis and tracked her time daily through an electronic system called KRONOS. (*Id.* ¶ 19.) Cain and other hourly employees used their identification badge to swipe themselves "in" and "out" of the KRONOS system at the time clock located in the kitchen adjacent to the York Hospital cafeteria. (*Id.* ¶ 20.) Because there was some concern that Food Services employees were not tracking their time correctly, Bentzel directed that an in-service training be held for all cafeteria workers on November 1, 2006. (*Id.* ¶ 23.) This training reiterated that manipulating time entries is a serious offense punishable by termination. (*Id.* ¶ 24.) All employees took a quiz at the end of this training to test their understanding of the material reviewed; Cain answered

four of the five question correctly, including that she could be terminated immediately for "[g]iving your coworker your badge and asking them to clock you in." (Doc. 36, Def.'s Ex. L (Post-Quiz) at Bates Nos. D-029 to D-030.)

## 2. **Events occurring on November 6, 7, 9, and 16, 2006**

The events giving rise to Cain's termination occurred on November 6, 7, 9, and 16, 2006—mere days after the November 1, 2006 in-service training. On those days, two cafeteria workers—Juanita Bowie and Yolanda Jamison—observed what they considered suspicious behavior by Tracie McClune. Specifically, on November 6, 2006, Bowie and Jamison saw McClune swipe her card at the KRONOS station when she arrived at work at 4:30 a.m., and later, at about 4:51 a.m., they again observed McClune swipe a card at the KRONOS station. (Doc. 36, Def.'s Ex. M, Juanita Bowie Aff., ¶¶ 4-5; Ex. N, Yolanda Jamison Aff., ¶¶ 4-5.) On that day, Bowie and Jamison did not see Cain until 5:10 a.m. when she walked into the kitchen with Elsie Wilson, another employee with whom she drove to work each day. (Bowie Aff. ¶ 6; Jamison Aff. ¶ 6.) Bowie and Jamison reported to Bentzel what they observed on November 6, 2006.[3]

On November 7, 2006, Bowie and Jamison again observed McClune swipe "in" twice: first at 4:40 a.m., and a second time at 4:55 a.m. (Bowie Aff. ¶ 8; Jamison Aff. ¶ 8.) After the second swipe, Bowie searched for Cain in the women's locker room located adjacent to the cafeteria, but could not find her. (Bowie Aff. ¶ 9.) While she did this, Joe Meneeley, a sous chef, searched for Cain in the kitchen, cafeteria, and Food Services office, but could not find her. (Doc. 36, Def.'s Ex. O,

---

[3]The record does not reflect why Bowie and Jamison suspected that McClune was swiping "in" for Cain as opposed to some other employee. The court's curiosity aside, it is immaterial.

Joseph Meneeley Aff., ¶ 3.)  At approximately 5:10 a.m., Bowie saw Cain and Wilson walk into the cafeteria together with their coats on.  (Bowie Aff. ¶ 10.)  Bowie and Meneeley reported to Bentzel their observations on November 7, 2006.

On November 9, 2006, Jamison saw McClune swipe "in" at approximately 4:30 a.m.  (Jamison Aff. ¶ 9.)  At around 5:00 a.m., Bowie saw McClune swipe "in" again.  (Bowie Aff. ¶ 12.)  Neither Bowie nor Jamison saw Cain in the cafeteria on November 9, 2006 until well after 5:00 a.m.  (Bowie Aff. ¶ 13; Jamison Aff. ¶ 10.)  They reported to Bentzel what they observed on November 9, 2006.  (Bowie Aff. ¶ 14; Jamison Aff. ¶ 10.)

On November 16, 2006, Jamison noticed McClune swiping "in" at approximately 4:55 a.m.  (Jamison Aff. ¶ 12.)  According to her affidavit, this struck her has odd since it appeared that McClune had already been working for some time that day.  At approximately 5:05 a.m., Jamison searched the female locker room for Cain but could not find her; at the same time as Jamison's search, Meneeley searched the kitchen, cafeteria areas, and the Food Services office, but could not find Cain.  (Jamison Aff. ¶ 14; Meneeley Aff. ¶ 5.)  At approximately 5:16 a.m., Meneeley observed Cain and Wilson arriving in the kitchen area with their coats on.  (Meneeley Aff. ¶ 6.)  Jamison and Meneeley reported these observations to Bentzel.  (Jamison Aff. ¶ 15; Meneeley Aff. ¶ 7.)

In response to these observations, Bentzel reviewed the time records for the days in question.  (Bentzel Aff. ¶¶ 14-15, incorporating notes made at the time of his investigation, Ex. 1 (notes) at Bates No. D-031 to D-032.)  For November 6, 2006, McClune's time records indicate that she clocked "in" at 4:31 a.m. and "out" at 1:50 p.m.  (Simon Aff., Ex. 3 (Tracie McClune's time records) at Bates No. D-

5

243.) Cain's November 6, 2006 swipe "in" was at 4:51 a.m. and "out" at 7:08 p.m. (Simon Aff., Ex. 4 (Glenda Cain's time records) at Bates No. D-234.) This corresponds with the time-frame that Jamison and Bowie saw McClune make her second swipe of the morning. In contrast, Wilson's time records for November 6, 2006 indicate that she swiped "in" at 5:09 a.m. and "out" at 2:17 p.m. (Simon Aff., Ex. 5 (Elsie Wilson's Time Records) at Bates No. D-249.) Wilson's "in" time corresponds with the time-frame that Bowie and Jamison observed Wilson and Cain walking into the building.

The time records for the other days – November 7, 9, and 16, 2006—reveal a similar pattern. McClune's time record for November 7, 2006 indicates that she swiped "in" at 4:42 a.m. and "out" at 1:54 p.m. (Simon Aff., Ex. 3 at Bates No. D-243.) Cain's time record for that day reveal a swipe "in" at 4:56 a.m. and "out" at 7:10 p.m. (Simon Aff., Ex. 4 at Bates No. D-234). Wilson's time record for that day indicates that she swiped "in" at 5:11 a.m. (Simon Aff., Ex. 5 at Bates No. D-249.) McClune's time record for November 9, 2006 indicate that she swiped "in" at 4:30 a.m. and "out" at 1:40 p.m. (Simon Aff., Ex. 3 at Bates No. D-243.) Cain's time record for that day indicates a swipe "in" at 4:57 a.m. and "out" at 2:21 p.m. (Simon Aff., Ex. 4 at Bates No. D-234.) Wilson did not work that day. Finally, McClune's November 16, 2006 time record indicate a swipe "in" at 4:42 a.m. and "out" at 1:15 p.m. (Simon Aff., Ex. 3 at Bates No. 243.) Cain's time record for that day indicate a swipe "in" at 4:57 a.m. and a swipe "out" at 7:08 p.m. (Simon Aff., Ex. 4 at Bates No. D-234.) Wilson's time record for that day indicate a swipe "in" at 5:18 a.m. (Simon Aff., Ex. 5 at Bates No. D-250.) On all of the days

in question, Cain's swipe "in" time corresponds with McClune's second swipe "in," and is before Cain was observed in the building on those days.

In addition to reviewing a comparison of the time records of McClune, Cain, and Wilson, Bentzel reviewed an analysis of the time entries of all Food Services employees to determine whether McClune could have been swiping "in" for someone other than Cain. That analysis revealed that on the four days in question, a total of six Food Service employees cards were swiped "in" around the same time as McClune's second swipe, but only Cain's matched exactly on <u>all</u> four days. (Bentzel Aff. ¶¶ 14-15, incorporating notes made at the time of his investigation, Ex. 1 (notes) at Bates No. D-032.) Bentzel also compared Cain's and Wilson's time entries for the period from November 6 to 17, 2006. Except for the four dates in question, Wilson and Cain's swipe "in" time matched up almost exactly, which one would expect given that they commuted together. (*Id.*) Based on his investigation, Bentzel believed that Cain asked McClune to swipe her "in" on certain days when it appeared that Cain was going to arrive after her 5:00 a.m. starting time.

For her part, Cain disputes generally the above allegations. Specifically, she disputes the inference that McClune was swiping in for her, and that she should have swiped in at the same time as Wilson with whom she commuted. Cain does not provide any citation to the record to support her disagreement with the above stated facts. The only exception is that she cites to Elsie Wilson's deposition for the proposition that, although she and Wilson drove together, they did not start work at the same time. (Doc. 46, Pl.'s Ex. 6, Elsie

Wilson Dep. at 6-7.)  Because Cain did not provide any citation to the record, her general denials will not be considered.  *See supra*, n. 1.

### 3. Cain's termination

On December 7, 2006, Bentzel and Mary Chambers, Wellspan's Director of Human Resources, interviewed McClune regarding the suspicious time entries.  (SMF ¶ 79.)  McClune denied that anything improper took place, but admitted that she had previously swiped Plaintiff "in" using Plaintiff's badge but that she did not do so on November 6, 7, 9, or 16, 2006.  (*Id.* ¶¶ 80-81.)  After this interview, Bentzel accompanied McClune back to the cafeteria to clean out her locker and gather her belongings, as she was being sent home without pay for the day.  (*Id.* ¶ 84.)  McClune went into the women's locker room and was followed by Cain where the two remained for five minutes while Bentzel waited outside.  (*Id.* ¶¶ 85-86.)  When Cain came out of the locker room, Bentzel asked whether she had spoken to McClune.  When Cain responded that she had spoken to her, Bentzel asked Cain to accompany him so that they could talk to Mary Chambers.  (*Id.* ¶¶ 87-88.)  During the meeting, Cain admitted that on one occasion she had McClune swipe her "in," but denied that this occurred on November 6, 7, 9, or 16, 2006.[4]  Because he was not satisfied by the answers provided by Cain or McClune, as well

---

[4]There is some confusion in the record as to how many times Cain had another employee swipe her "in."  In response to Defendant's Statement of Material Facts, Cain admits that she only had another employee swipe her "in" on one occasion in the past.  (*See* Doc. 36 ¶ 92; Doc. 51 ¶ 92.)  Immediately after this admission, Cain states that it was McClune who swiped her "in" in the past, (*see* Doc. 36 ¶ 93; Doc. 51 ¶ 93), however, in the very next paragraph Cain admits that Bowie swiped her "in" one time in the past, (*See* Doc. 36 ¶ 94; Doc. 51 ¶ 94.)  Thus, it is unclear from the records whether Cain admits that she was swiped "in" by two different employees in the past—McClune and Bowie—or that it was just McClune.  In any event, it is undisputed that Cain admitted to Bentzel that she had another employee swipe her "in" when she was not at work.

as, in the case of Cain, what Bentzel believed to be past incidents of dishonesty, Bentzel fired both Cain and McClune in December 2006.

Regarding the past incidents of dishonesty, it is undisputed that in December 2004, Cain provided a $40 deli platter to a relative of hers without paying for it, and she made no record of providing the platter so that she could pay for it later. (SMF ¶¶ 100-02.) As a result, Bentzel issued Cain a final warning for dishonesty. (Doc. 36, Ex. R.) Cain disputes that the conduct for which she received the warning was dishonest, and cites to the deposition testimony of other employees who testified that this was accepted practice. (*See* Doc. 46, Ex. 5, Dep. of Lisa Washington at 12; Ex. 4, Dep. of Carol Willow at 25.) However, it is undisputed that Cain did not voice objection to the discipline at the time it occurred, and did not file an internal grievance. (SMF ¶ 106.)

In December 2005, after conducting an internal audit of cafeteria cashiers, Wellspan became aware that cashiers were providing a large number of free lunches to resident's families and pocketing some cash transactions. (*Id.* ¶¶ 108-09.) Based on the audit's findings, Cain was issued another final warning because she often worked the cash register and supervised all cafeteria cashiers. (*Id.*, ¶¶ 110-111, 113.) A warning was also given to McClune at the same time. (*Id.*, ¶ 113.)

### 4. **Other employees**

Close to the time that Cain and McClune were terminated, Wellspan also disciplined other employees for time record manipulation. Jeff Heller, a Caucasian male, is a security officer in Wellspan's Security Department. (SMF ¶ 117.) In 2005, Heller held the position of security supervisor and was supervised by

Jeri Pickel, the Director of Security. Pickel discovered that Heller had improperly reported his hours in KRONOS by entering himself as "in" at a time he was not working. (*Id.* ¶ 122.) According to Pickel, Heller had "been an exemplary employee" up to that point. (Doc. 36, Def.'s Ex. U, Jeri Pickel Aff., ¶ 12.) When confronted with this information, Heller confessed, and was demoted from security supervisor to security officer. (*Id.* ¶¶ 14, 16-17.) Bentzel never supervised Heller, and did not participate in the decision to demote him. (*Id.,* ¶¶ 17-18; Bentzel Aff. ¶¶ 26-27.) Likewise, Pickel never supervised Cain, and did not participate in the decision to terminate her. (Pickel Aff. ¶ 19-20.)

In addition to Cain and McClune, Wellspan terminated other employees for manipulating time entries. Specifically, Wellspan terminated the employment of Karen Keener as a technician in the Department of Imaging. (Simon Aff. ¶ 14.) Keener is a Caucasian female. (*Id*. ¶ 15.) Wellspan terminated the employment of George Barnette as a security supervisor in its Security Department. (*Id.* ¶¶ 21, 23.) Barnette is a Caucasian male. (*Id.* ¶ 22.) In addition, Wellspan terminated the employment of Brandon Ducharme as a security officer in the Security Department. (*Id.* ¶¶ 24, 26.) Durcharme is a Caucasian male. (*Id.* ¶ 25.) Finally, Wellspan

terminated the employment of James Jackson as a nursing assistant in the Hospital's Operating Room.[5] (*Id.* ¶¶ 17, 19.) Jackson is a male.[6] (*Id.* ¶ 18.)

The parties cite to one other male who was terminated during the relevant time period, but dispute the factual basis for his termination. It is undisputed that Wellspan terminated the employment of Thomas Montouth on August 25, 2008, and that Montouth is male. (*Id.* ¶¶ 21, 23.) Wellspan contends that, unlike the others, Montouth was not terminated for manipulating time entries; he was terminated because he was no longer available to work. (*Id.* ¶ 23.) Cain asserts that Montouth *should* have been terminated for manipulating time records but was not fired. She refers to the reports of Linda Bowman, her cousin, a former employee who worked as a security operation technician in Wellspan's Security Department. (Doc. 36, Def.'s Ex. V, Dep. of Linda Bowman, at 7:8-9; 14:15-21.) Bowman contends that Montouth and James Jackson were signing each other in during the night shift so that they could get paid even when they were not there. (*Id.* at 24:3-12; 29:3-14.) There is no evidence suggesting that Bowman witnessed either Jackson or Montouth swiping each other "in" on the KRONOS system. (*Id.* at 25:9-21.) Furthermore, Bowman never reported her suspicions to Wellspan management. (*Id.* at 27:7-17; 28:4-16.) The court will address the relevance of this

---

[5]In response to Wellspan's statement of material facts, Cain asserts that Jackson was not fired, but rather, he voluntarily quit his employment. (*See* Doc. 51, ¶ 148.) Cain provides no citation to the record to support her assertion that Jackson quit. Wellspan references in its reply brief the fact that Cain argues Jackson quit his position because he knew that he was going to be fired for manipulating his time records, (*see* Doc. 54 at 8 n. 2), however, it is Cain's burden to produce evidence to support her version of the facts in opposition to summary judgment. Because Cain did not provide any citation to the record, her general denials will not be considered, *see supra*, n. 1, and the court will deem the facts as alleged—and supported by admissible evidence—by Defendant as true.

[6]Neither party references Jackson's race or ethnicity.

11

evidence when it addressed Cain's discrimination arguments below. *See infra*, Part III.A. at n. 8.

### B.   Procedural History

Cain initiated this action by filing a complaint on September 15, 2008, (Doc. 1), and an Amended Complaint on March 20, 2009, (Doc. 13). Defendant filed its answer on March 27, 2009. (Doc. 19.) After an acrimonious discovery period, Defendant filed its motion for summary judgment on September 23, 2009, along with its statement of material facts and exhibits. (Docs. 35-36.) Defendant's brief in support was filed the next day. (Doc. 39.) After being given additional time by the court, Plaintiff filed her brief in opposition to Defendant's motion for summary judgment on October 24, 2009. (Doc. 48.) Plaintiff filed her exhibits in support of her opposition the next day. (Doc. 46.) Plaintiff did not file a response to Plaintiff's statement of material facts until November 6, 2006. (Doc. 51.) After being given additional time by the court, Defendant filed its reply brief on November 13, 2009. (Doc. 54.) Defendant's motion is ripe for disposition.

## II.    Legal Standard

"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56c; *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        Discussion

In her complaint, Cain asserts that the real reason she was fired is because she is African-American and/or a woman and/or both.  In so doing, Cain brings a claim under Title VII of the Civil Rights Act of 1964.  Cain also asserts a state common law tort claim for intentional infliction of emotional distress.  Specifically, she asserts that the acts of discrimination and unwarranted discipline by Wellspan were so extreme and outrageous as to cause her emotional distress.  Finally, Cain claims that there was an employment contract between her and Wellspan, and that Defendant breached the contract by terminating her.

In its motion for summary judgment, Wellspan argues that Cain's race and gender discrimination claims fail as a matter of law because she cannot establish a prima facie case, and, even if she could, she has produced insufficient evidence to rebut Wellspan's legitimate, nondiscriminatory justification for Cain's discharge.  Wellspan also contends that Cain's state law claims fail as a matter of law because she has not demonstrated that Wellspan's actions were extreme and outrageous, and there is no evidence suggesting any contractual relationship between the parties.  The court agrees with each of Wellspan's conclusions, and for the reasons that follow will grant its motion for summary judgment.

### A.    Title VII

Title VII prohibits an employer from discharging an employee based on, among other things, her race or gender.  *See* 42 U.S.C. § 2000e-2(a)(1).  In *McDonnell Douglas*, the Supreme Court created a three-part structure for the presentation of evidence in Title VII cases where the Plaintiff does not have direct evidence of discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802 (1973). To survive summary judgment, the plaintiff must first produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case of discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). To establish a prima facie case of race or gender discrimination, a plaintiff must adduce evidence that (1) she belongs to a protected class, (2) she was qualified for the position in question, (3) she was terminated, and (4) the circumstances surrounding her termination give rise to an inference of unlawful discrimination. *Weston v. Commonwealth of Pa.,* 251 F.3d 420, 430 (3d Cir. 2001); *Tran v. Delavau, LLC,* 615 F. Supp. 2d 381, 388 (E.D. Pa. 2009).

If the plaintiff offers sufficient proof of these elements, step two is reached. The burden of production—but not the burden of persuasion—shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for discharging the employee. *Keller*, 130 F.3d at 1108. If the defendant cannot satisfy this burden, summary judgment must be denied.

On the other hand, if the defendant does satisfy this burden, step three is reached. The plaintiff may then survive summary judgment only by "submitting evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).)

In resolving Wellspan's motion, the court finds it unnecessary to consider steps one and two of the *McDonnell Douglas* scheme. Step two is not

15

contested. Wellspan has come forward with evidence that, if believed, is a legitimate non-discriminatory reason for Cain's termination. Specifically, Wellspan terminated Cain because it believed that Cain and McClune manipulated time records, she did not acknowledge that she did so, and she had prior disciplinary action against her concerning dishonest conduct. (*See* Bentzel Aff. ¶ 23.) Although the parties dispute whether Cain has produced sufficient evidence to state even a prima facie case, the court will assume for the sake of argument that she did, because the court finds that Cain cannot satisfy step three under either the first or second prong of the *Fuentes* test.[7]

As noted above, to meet step three under *McDonnell Douglas* Cain must produce some evidence "from which a factfinder could reasonably . . . disbelieve the employer' s articulated legitimate reasons or . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Wellspan asserts that it terminated Cain's employment "in response to evidence strongly suggesting she enlisted a subordinate to make fraudulent time entries for her in violation of Wellspan's Time Keeping and Corrective Action policies." (Doc. 39 at 15.) Wellspan argues that Cain has adduced no evidence from which a factfinder could reasonably disbelieve this reason. Wellspan points to the fact that Bentzel

---

[7]Wellspan concedes that Cain satisfied the first three prongs of the prima facie test, but argues—at least as to Cain's race discrimination claim—that she could not meet the last prong, that is, she could not establish that circumstances surrounding her termination logically gives rise to an inference of race discrimination. Wellspan argues that since both Cain and McClune were terminated for precisely the same conduct, and McClune is Caucasian and Cain is African-American, that there is no logical inference of race discrimination. The court agrees, but finds it unnecessary to so hold because of Cain's ultimate failure to demonstrate that Wellspan's stated reason for termination was a pretext for discrimination.

fielded a number of complaints that McClune might be swiping "in" for Cain before Cain arrived at work. He confirmed these eyewitness accounts by cross-referencing the relevant time records. Bentzel even went so far as to cross reference the time records of all Food Services employees to confirm that McClune was swiping "in" for Cain, as opposed to another Food Services employee. Finally, Bentzel confronted Cain and McClune, who both confessed to previous time record manipulation, just not on the days specifically inquired about. Given the weight of this evidence, Wellspan argues that no factfinder could reasonably conclude that Wellspan chose to fire Cain because she is a woman or because she is African-American as opposed to firing her for her probable dishonesty.

Cain does not offer evidence or argument of any alleged weaknesses, implausibilities, and inconsistencies that would cast doubt on Wellspan's proferred reasons for her termination, other than to challenge Wellspan's conclusion that she had McClune swipe her "in" on the days in question. Cain's focus on the underlying investigation is misplaced. As the Third Circuit explained, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Fuentes*, 32 F.3d at 765. Put simply, the court is not here to review the logic of Wellspan's business decision to terminate Cain, and does not act as a super-personnel committee reviewing the decision to ensure that there was just cause for her termination. Instead, the relevant inquiry—and the one which Cain as the non-moving party must come forward with evidence to

support—is whether the real reason for the termination was discrimination. Cain has come forward with no such evidence.

While the procedures employed by Wellspan to investigate the allegations of wrong doing by Cain would possibly be relevant if she had produced evidence that Wellspan used some other procedures where similar complaints were lodged against Caucasian or male employees, she has produced no such evidence and, thus, her focus on the underlying investigation is merely a distraction. The record is devoid of any evidence that Wellspan approached other similarly situated allegations of dishonesty differently. Cain argues that this is not true, and points to Wellspan's handling of Jeff Heller's—a Caucasian male— manipulation of his time sheet as evidence that Wellspan's stated reason for terminating Cain was pretextual. A review of the facts in the record, however, reveals the flaws in Cain's argument.

Cain and Heller are not similarly situated—a necessary prerequisite for any comparison of the handling of their circumstances. *See Opsatnik v. Norfolk S. Corp.*, No. 08-2177, 2009 WL 1931170, at *3 (3d Cir. May 19, 2009) (stating that in order to demonstrate pretext by reference to the treatment of other employees outside of the protected class, a plaintiff must produce evidence that she was similarly situated in "all relevant respects"). Substantial similarity is determined in the context of each case, "but often includes a 'showing that the two dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). It is unclear from Cain's brief what similarities she is alleging that she and Keller share other than that

both of them were employees of Wellspan. This is not enough. The record reflects that Heller was an employee of Wellspan's Security Department, not the Food Services Department. (SMF ¶ 117.) He reported to a different supervisor than Cain, and it is clear that Bentzel took no part in the decision to discipline Keller. (SMF ¶ 122; Pickel Aff. ¶ 17-18; Bentzel Aff. ¶¶ 26-27.) While evidence of different supervisors is not per se dispositive, it is logical that different supervisors will exercise their discretion with different employees differently. *See Radue*, 219 F.3d at 618. This becomes particularly relevant when the facts of Cain's termination and Heller's demotion are juxtaposed.

Although both Cain and Heller engaged in time keeping manipulations, Wellspan cites convincing differences between the two. For example, according to Jeri Pickel—Heller's supervisor—Heller had an exemplary record prior to the discovery of his time keeping manipulation, and Keller's only discipline in fourteen years did not involve dishonesty. (Pickel Aff. ¶ 13.) In contrast, Cain had been issued two final warnings by Bentzel in the two years immediately preceding her termination. Both of these prior incidents arguably involved issues of dishonesty: not paying for a deli tray that she had made in the cafeteria, and providing free lunches to resident's families. Furthermore, Heller acted alone in his manipulation of his time records, whereas Cain was accused of enlisting the assistance of McClune, a subordinate whom she supervised, to manipulate her time. The court finds that these facts demonstrate that Heller's case involved a variety of mitigating circumstances that distinguish his conduct from Cain's and forecloses her ability to claim that they are similarly situated.

Furthermore, as Wellspan points out, at least four other Caucasian employees—McClune, Brandon Ducharme, George Barnette, and Karen Keener—two of whom are also males—have been terminated by Wellspan for manipulating time entries. (Bentzel Aff. ¶ 24; Simon Aff. ¶¶ 14-16; Pickel Aff. ¶¶ 21-26.) Thus, even if Cain and Heller were similarly situated, the mere fact that Heller was demoted and not terminated does not as a matter of law establish that male Caucasians were treated more leniently. As the Third Circuit has held, "a plaintiff does not create an issue of fact by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her." *Simpson v. Kay Jewelers,* 142 F.3d 639, 642 (3d Cir. 1998).

In the end, Cain has not produced, nor has the court been able to find, any evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Wellspan's explanation for terminating Cain's employment from which a reasonable factfinder could "disbelieve [Wellspan's] articulated legitimate reasons or . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Wellspan's] action." *Fuentes*, 32 F.3d at 765. Accordingly, Cain has failed to satisfy her burden of raising a triable issue of fact as to pretext, and the court will grant Wellspan's motion for summary judgment as to her claims for discrimination based on race and gender.[8]

---

[8]To the extent that Cain relies on the fact that Thomas Montouth was not fired for alleged time-keeping manipulation the court finds that there is insufficient evidence in the record from which a factfinder could reasonably conclude that Montouth manipulated his time records, and, even if he did, that Wellspan was aware that this occurred. As Linda Bowman indicated in her deposition, she never

(continued...)

**B.     Intentional Infliction of Emotional Distress**

A claim for intentional infliction of emotional distress requires a plaintiff to prove that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe. *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 250 (E.D. Pa. 1999) (citations omitted).  In order to state a cognizable claim, the conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew v. Sears Roebuck & Co.*, 868 F.Supp. 98, 103 (E.D. Pa. 1994).  As the Supreme Court of Pennsylvania has stated,"'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'" *Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998) (quoting *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988)).

According to the Amended Complaint, Cain asserts that Wellspan's "acts of discrimination" and "unwarranted discipline" were extreme and outrageous. (Doc. 13, ¶ 28.)  In her brief in opposition to summary judgment, she adds that Wellspan terminated her without evidence that she had violated a company rule, she did not have an opportunity to confront her accusers, and she did not have an opportunity to have someone represent her when she appealed her termination.

---

[8](...continued)
reported her suspicions of Montouth's activity to Wellspan management.  (Bowman Dep. at 21:7-17; 28:4-16.)  Thus, the court concludes that Cain and Wellspan were not similarly-situated and cannot serve as a relevant comparison for purposes of establishing pretext.

Based on the evidence before the court, no factfinder could reasonably conclude that Wellspan's conduct—even resolving all inferences in favor of Cain—was "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew*, 868 F.Supp. at 103. The court has already addressed the investigation that Wellspan performed before it fired Cain. *See supra*, Part III.A. Even if Bentzel's conclusion to fire Cain was improper or imprudent, given the substantial circumstantial evidence that Cain did what she was accused of doing, Cain's termination does not shock the conscience. Moreover, there is no evidence that Wellspan fired Cain in any sort of public or humiliating manner. In opposing summary judgment, Cain must produce some evidence to support her claim. She has provided none. Accordingly, Cain has failed to satisfy her burden of raising a triable issue of fact as to her claim for intentional infliction of emotional distress, and the court will grant Wellspan's motion for summary judgment as to that claim.

## C. <u>Breach of Contract</u>

In Count IV of her Amended Complaint, Cain asserts a claim for breach of contract alleging that Wellspan's employee handbook and personnel polices promised her that she would be "treated fairly and justly and that she would be judged on the bases of individual merit, ability, and the content of her character and not by the color of her skin or her gender." (Doc. 13, ¶ 35.) Cain further contends that these documents created a vested right in her employment retirement fund and that "her right to benefit from said retirement fund would not be taken away or reduced unfairly of unjustly by any acts of the Defendant." (*Id.*, ¶ 37.) Despite these averments in Plaintiff's complaint, there is simply no evidence in the record

supporting Cain's assertion that the employee handbook created a contract between Cain and Wellspan. The handbook states, unequivocally, that "the information in this handbook should not be considered a contract of employment between you and Wellspan Health or any of its related organizations or affiliates . . . . This handbook, and the polices described here-in do not alter the at-will employment relationship between you and your employers." (Doc. 36, Def.'s Ex. K (Wellspan Employee Handbook) at 2.)

Even ignoring the explicit language contained in Wellspan's handbook, Cain acknowledged in her deposition that she understood that the employee handbook was not intended to be a contract. (*See* Doc. 36, Def.'s Ex. W (July 9, 2009 Dep. of Glenda Cain) at 89:14-17 ("Q: And you understand that the employee handbook from Wellspan is not intended to be a contract between you and Wellspan; right? A: Right.") Despite this, Cain now contends that she did rely on various statements and writings of Wellspan in which it stated that she would not be discriminated against on the bases of race and gender, and that she would be treated fairly in regard to her employment and pension plan.

The court has already determined that Cain's claims of discrimination based on race and gender fail as a matter of law. Cain cannot maintain a cause of action for breach of contract based on a promise not to discriminate where her evidence of discrimination is lacking. More fundamentally, Wellspan was under a legal obligation to refrain from race and/or gender discrimination under both state and federal law. *See* 42 U.S.C. § 2000e-2(a)(1); 43 Pa. Cons. Stat. Ann. § 955(a). Thus, it is difficult for the court to see how this legal obligation constituted a contractual promise by Wellspan. Finally, there is no evidence before the court that

the pension promises made by Wellspan created an employment contract between Cain and Wellspan. In fact, there is no evidence before the court concerning the nature of the promises allegedly made regarding Cain's pension. At this stage of the proceedings, Cain cannot simply sit back and rely on the bald allegations contained in her complaint; instead, she must come forward with some evidence showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Cain has come forward with no facts creating even the slightest inference that there was an employment contract between her and Wellspan. Accordingly, Cain has failed to satisfy her burden of raising a triable issue of fact as to her claim for breach of contract, and the court will grant Wellspan's motion for summary judgment as to that claim.

**IV.** **Conclusion**

Because Cain has come forward with no evidence satisfying her burden of raising a triable issue of fact as to any of her claims, the court will grant Wellspan's motion for summary judgment on all counts in Cain's Amended Complaint. Given this disposition of Wellspan's summary judgment motion, the court will deem all of Wellspan's motions in limine, (Docs. 55, 57, 59, 64) moot. The court will issue an appropriate order.

s/Sylvia H. Rambo
United States District Judge

Dated: December 17, 2009.

24

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GLENDA CAIN                           :
                                      :
        Plaintiff                     : CIVIL ACTION NO. 1:08-CV-1704
                                      :
        v.                            :
                                      :
WELLSPAN HEALTH                       :
                                      :
        Defendant                     :

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS
HEREBY ORDERED THAT**:

(1) Defendant Wellspan Health's motion for summary judgment, (Doc.
35), is **GRANTED**;

(2) Defendant Wellspan Health's motions in limine, (Docs. 55, 57, 59,
and 64), are **DEEMED MOOT**; and

(3) The clerk of court shall enter judgment for Defendant Wellspan
Health against Plaintiff Glenda Cain on all counts of Plaintiff's Amended Complaint
and close the case.


                                    s/Sylvia H. Rambo
                                    United States District Judge

Dated:  December 17, 2009.